**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CIVIL ACTION H-18-4020 |
| | § | |
| AMARJIT GILL, as Representative of the | § | |
| Estate of JAGMAIL S. GILL, and AMARJIT | § | |
| GILL, | § | |
| | § | |
| *Defendants.* | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the court is a motion to dismiss filed by Amarjit Gill, as the representative of the Estate of Jagmail S. Gill (the "Estate"). Dkt. 31. After considering the motion, response, reply, and applicable law, the court is of the opinion that the motion should be DENIED.

### I. BACKGROUND

This memorandum opinion and order is about whether civil penalties assessed under 31 U.S.C. § 5321(a)(5)(B)(i) ("FBAR Penalties") survive death. The plaintiff, the United States of America (the "Government"), filed its complaint against Jagmail S. Gill on October 14, 2018. Dkt. 1. In the complaint, the Government asserted that Mr. Gill, who became a green card holder and was lawfully admitted to the United States in 1984 and then became a citizen of the United States in 2008, failed to report any of his foreign income on his originally filed U.S. income tax returns for 2005 through 2010. *Id.* He also did not disclose that he had signature authority, control or authority over, or an interest in numerous foreign bank accounts that had an aggregate balance of more than $10,000. *Id.* The Government asserts that this failure to file was non-willful. *Id.* The Internal Revenue Service assessed FBAR Penalties of $740,848 pursuant to § 5321(a)(5) for

Mr. Gill's non-willful failure to timely file FBARs reporting his financial interest in the foreign bank accounts. *Id.* Gill did not timely pay these penalties, and the Government filed this lawsuit. *Id.*

The Government served Mr. Gill in London on December 19, 2019. Dkt. 8. Mr. Gill filed an answer on February 14, 2020. Dkt. 10. On March 30, 2020, Mr. Gill moved to consolidate a separately filed case against his wife, Amajit K. Gill, into this case. Dkt. 20. The court granted that motion. Dkt. 21. The complaint the Government filed against Ms. Gill is similar to the complaint filed against Mr. Gill, except the Government alleges an interest in fewer foreign bank accounts, and the FBAR Penalties assessed were $55,304.55. *United States v. Gill*, No. 4:18-cv-4032, Dkt. 1.

On May 14, 2020, the Government filed a "suggestion of death" in which it informed the court that Mr. and Ms. Gill's counsel had informed the Government on April 28, 2020, that Mr. Gill passed away on April 2, 2020, in the United Kingdom. Dkt. 22. On July 8, 2020, the Government filed a motion to appoint and substitute a personal representative for the estate of Jagmail S. Gill because no executor or personal representative had been appointed for Mr. Gill's estate due to the world pandemic. Dkt. 23. Mr. Gill's counsel filed an opposition, arguing that the Government's claims do not survive death, so no representative was needed. Dkt. 24. After the motion to fully briefed, the court issued an order in which it noted the "very unusual situation" and the need to be flexible. Dkt. 29. It decided to *sua sponte* stay the case until Mr. Gill's estate was opened and a representative appointed. *Id.* On March 15, 2021, counsel for Ms. Gill informed the court that she was officially appointed as the representative of Jagmail S. Gill's estate, and the court reopened the case. Dkt. 30.

On the same day counsel informed the court about the appointment of Ms. Gill as the representative of the Estate, the Estate filed its motion to dismiss. Dkt. 31. In the motion, the Estate argues that in the Fifth Circuit, survivability of claims under a federal statute turns on whether the "primary purpose" of the statute is remedial or penal; if it is remedial, it survives death, and if it is penal, it does not. *Id.* The Estate contends that the primary purpose of FBAR Penalties is to redress and deter general wrongs to the public and not individual wrongs. Dkt. 31. The Estate asserts that the penalties provide a recovery to the public, in general, not individual restitution, and that they are disproportionate to the alleged harm suffered by the Government, which, under the test the Estate contends applies, equates to the statute have a penal rather than remedial primary purpose. *Id.* The Estate asserts that because the statute's primary purpose is penal, the Government's claims against Mr. Gill went away when Mr. Gill died, and the claims against Mr. Gill's Estate should therefore be dismissed.

The Government argues that FBAR Penalties survive death pursuant to 28 U.S.C. § 2404. Dkt. 32. It argues, in the alternative, that FBAR Penalties are remedial, that the opinions of other courts that have held that they are remedial are persuasive and well-reasoned, that the penalties compensate the Government for harm, and that the cases relied upon by the Estate are not applicable. *Id.*

In reply, the Estate argues that 28 U.S.C. § 2404 is procedural and does not relate to the actual merits of the claim. Dkt. 33. As to the Government's other arguments, the Estate contends that the Government ignores critical cases and that its response does not alter the fact that the factors considered by the Fifth Circuit weigh in favor of finding that the non-willful FBAR Penalties were extinguished by Mr. Gill's death. *Id.*

The motion to dismiss is now ripe for disposition.

## II. LEGAL STANDARD

The Estate filed its motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). Dkt. 31.  "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 1964–65 (2007).  In considering a Rule 12(b)(6) motion to dismiss a complaint, courts generally must accept the factual allegations contained in the complaint as true.  *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1050 (5th Cir. 1982).  The court does not look beyond the face of the pleadings in determining whether the plaintiff has stated a claim under Rule 12(b)(6).  *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999).  "[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, [but] a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555 (citations omitted).  The "[f]actual allegations must be enough to raise a right to relief above the speculative level."  *Id.*  The supporting facts must be plausible— enough to raise a reasonable expectation that discovery will reveal further supporting evidence. *Id.* at 556.  A complaint may also be dismissed under Rule 12(b)(6) "'on the basis of a dispositive issue of law.'"  *Walker v. Beaumont Ind. Sch. Dist.*, 938 F.3d 724, 734 (5th Cir. 2019) (quoting *Neitzke v. Williams*, 490 U.S. 319, 326, 109 S. Ct. 1827, 104 L.Ed.2d 338 (1989)).  "All questions of fact and any ambiguities in the controlling law must be resolved in the plaintiff's favor."  *Lewis v. Fresne*, 252 F.3d 352, 357 (5th Cir. 2001).

## III. ANALYSIS

The question addressed by the Estate's motion is whether the FBAR Penalties assessed against Mr. Gill survived his death.  The court will first consider whether the penalties

automatically survive pursuant to 28 U.S.C. § 2404 as the Government asserts. The court will then discuss, notwithstanding § 2404, the factors courts consider when determining whether a statute survives death. It will then consider, specifically, what FBAR Penalties are and why they are assessed. And finally, it will discuss the cases relied upon by the parties and determine whether the penalties assessed against Mr. Gill survive in light of this law.

## A.    Section 2404

The Government argues that its claims survive Mr. Gill's death under 28 U.S.C. § 2404 because it brought the claims before Mr. Gill died. Dkt. 32. Under this statute, a "civil action for damages commenced on or behalf of the United States or in which it is interested shall not abate on the death of a defendant but shall survive and be enforceable against his estate as well as against surviving defendants." 28 U.S.C. § 2404. The United States contends that the FBAR penalties are "damages" within the meaning of this statute because they are remedial in nature and that the claims thus survive Mr. Gill's death. Dkt. 32.

The Estate contends that § 2404 is a procedural rule allowing a civil action to continue against a defendant's estate. Dkt. 33. It asserts that the U.S. Supreme Court has held that an action against a deceased party cannot continue unless it is one that survives by law, and in the Fifth Circuit that requires that its primary purpose be remedial and not penal. *Id.* It points out that the Government was not required to refile its civil action against the defendant's estate under § 2404, which has nothing to do with whether the underlying claim survives death. *Id.*

Section 2404 specifically relates to a "civil action for damages." 28 U.S.C. § 2404. In *United States v. Price*, the Sixth Circuit clarified that one cannot simply label a civil action as one for damages for § 2404 to apply. 290 F.3d 525, 526 (6th Cir. 1961). Instead, "whether an action is one for damages or to enforce a penalty depends upon what is sought to be recovered by it." *Id.*

It noted that under Sixth Circuit law, if the case was "brought to compensate for an injury to the United States, it is one for damages and does not abate the death of the defendant," but if "no direct injury has been done to the United States, the action is not for compensation but for the recovery of a penalty," and it "abates upon the death of a defendant." *Id.* It noted that § 2404 assumes the question of whether it is a civil action for damages is a settled question, and that question was disputed in *Price*. It is also disputed here, as the parties disagree about whether the FBAR Penalties are remedial or a penalty. Thus, while § 2404 allows the claim to proceed against the Estate if it is remedial and thus a "civil action for damages," the court must first determine whether the claim is primarily remedial or penal.

## B.    Statutes Surviving Death

Whether a federal statutory claim survives the death of the defendant (survivability) is a matter of federal law. *In re Wood*, 643 F.2d 188, 190 (5th Cir. 1980); *cf. Carlson v. Green*, 446 U.S. 14, 23, 100 S. Ct. 1468 (1980) ("*Bivens* actions are a creation of federal law and, therefore, the question of whether respondent's action survived Jones' death is a question of federal law."); *Burks v. Lasker*, 441 U.S. 471, 476, 99 S. Ct. 1831 (1979) ("Since we proceed on the premise of the existence of a federal cause of action, it is clear that our decision is not controlled by [*Erie*]." (cleaned up)). "It has long been established that causes of action predicated on penal statutes do not survive . . . death, . . . whereas remedial damage actions do survive." *In re Wood*, 643 F.2d at 190 (citing *Schreiber v. Sharpless*, 110 U.S. 76, 3 S. Ct. 423 (1884) ("At common law, actions on penal statutes do not survive.")) (discussing whether a claim under the Bankruptcy Act survived the debtor's death); *see Malvino v. Delluniversita*, 840 F.3d 223, 229 (5th Cir. 2016) ("The general rule for the survivability of federal statutes is that penal statutes do not survive, whereas remedial statutes do." (citing *In re Wood* and *Schreiber*)). The use of the term "penalty" does not necessarily

mean the statute is penal. *In re Wood*, 643 F.2d at 190 (noting that the meanings of the terms "penal" and "penalty" often depend on the context). "A remedial action is one that compensates an individual for specific harm suffered, while a penal action imposes damages upon the defendant for a general wrong to the public." *United States v. NEC Corp.*, 11 F.3d 136, 137 (11th Cir. 1993).

In the Fifth Circuit, courts analyze three factors to determine whether a statute is penal or remedial: "'(1) whether the purpose of the statute was to redress individual wrongs or more general wrongs to the public; (2) whether recovery under the statute runs to the harmed individual or to the public; and (3) whether the recovery authorized by the statute is wholly disproportionate to the harm suffered.'" *In re Wood*, 643 F.2d at 191 (quoting *Murphy v. Household Fin. Corp.*, 560 F.2d 206, 209 (6th Cir. 1977)); *see also Malvino*, 840 F.3d at 229 (relying on these same factors to determine "'whether the wrong sought to be redressed is a wrong to the public, or a wrong to the individual'" (quoting *In re Wood*, 643 F.2d at 191)); *Irvin-Jones v. Equifax Info. Servs., LLC*, No. H-18-3224, 2019 WL 4394684, at *2 (S.D. Tex. Sept. 13, 2019) (Lake, J.) (considering whether claims for punitive damages under the Fair Credit Reporting Act survive death, noting that a remedial action compensates an individual for a specific harm suffered and a penal action imposes damages for a general wrong to the public, and finding that the FCRA "serves both remedial and penal purposes" but the punitive damages portion "serves to punish and deter" and does not survive death).

Some courts, however, find that if the United States itself is the party that suffered harm because of a defendant's conduct, the *In re Wood* factors, while instructive, are not necessarily on point. *See United States v. Green*, 457 F. Supp. 3d 1262, 1269 (S.D. Fla. 2020); *United States v. Wolin*, 489 F. Supp. 3d 21, 28 (E.D.N.Y. 2020) (stating that the *Green* court expressly rejected the use of the *In re Wood* factors when the Government is the harmed party and finding that a claim

for FBAR Penalties is remedial). These courts apply the test set forth in *Hudson v. United States*, 522 U.S. 93, 118 S. Ct. 488 (1997) (considering whether administrative penalties imposed for violating federal banking statutes bar later criminal prosecution under the Double Jeopardy Clause). *See, e.g.*, *Green*, 457 F. Supp. 3d at 1269; *United States v. Estate of Schoenfeld*, 344 F. Supp. 3d 1354, 1370 (M.D. Fla. 2018). Under the *Hudson* framework, courts considering whether a civil penalty should be considered criminal are tasked with "(1) asking whether the legislature expressed a preference for labeling the penalizing mechanism as civil or penal, and (2) applying the seven '*Kennedy* factors.'" *Estate of Schoenfeld*, 344 F. Supp. 3d at 1370 (relying on *Hudson*). The *Kennedy* factors include:

> (1) whether the sanction involves an affirmative disability or restraint; (2) whether it has historically been regarded as a punishment; (3) whether it comes into play only on a finding of scienter; (4) whether its operation will promote the traditional aims of punishment—retribution and deterrence; (5) whether the behavior to which it applies is already a crime; (6) whether an alternative purpose to which it may rationally be connected is assignable for it; and (7) whether it appears excessive in relation to the alternative purpose assigned.

*Id.* (cleaned up) (quoting *Hudson* quoting *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168–69, 83 S. Ct. 554 (1963)).

Courts tend to agree that if a claim does not "fall neatly within the penal or remedial categories," the court should consider the "primary purpose" of the statute. *Green*, 457 F. Supp. 3d at 1268; *see Malvino*, 840 F.3d at 230–31 (finding that RICO damages, which are awarded to the harmed individual rather than the public, are remedial). The court therefore must determine whether the primary purpose of the FBAR Penalties the Government seeks to enforce here is penal or remedial. It will be guided by both the *In re Wood* and *Kennedy/Hudson* factors as well as the statute itself, which it turns to now.

## C. FBAR Penalties

### 1. What Are FBAR Penalties?

The penalties assessed under § 5321(a)(5) are for violations of 31 U.S.C. § 5314, which states:

> (a) Considering the need to avoid impeding or controlling the export or import of monetary instruments and the need to avoid burdening unreasonably a person making a transaction with a foreign financial agency, the Secretary of the Treasury shall require a resident or citizen of the United States or a person in, and doing business in, the United States, to keep records, file reports, or keep records and file reports, when the resident, citizen, or person makes a transaction or maintains a relation for any person with a foreign financial agency. The records and reports shall contain the following information in the way and to the extent the Secretary prescribes:
> (1) the identity and address of participants in a transaction or relationship.
> (2) the legal capacity in which a participant is acting.
> (3) the identity of real parties in interest.
> (4) a description of the transaction.

31 U.S.C. § 5314(a). The Secretary of Treasury implemented the following regulation under the power provided in § 5314(a): "Each United States person having a financial interest in, or signature authority over, a bank, securities, or other financial account in a foreign country shall report such relationship" to the IRS "each year in which such relationship exists." 31 C.F.R. § 1010.350(a). The report is called a Foreign Bank and Financial Accounts Report, or FBAR. *See id.* (discussing Form TD F 90-22.1). FBAR forms must be filed by June 30 of each calendar year for foreign financial accounts exceeding $10,000. 31 C.F.R. § 1010.306(c).

The penalties under § 5321(a)(5)(B) for violating § 5314, "shall not exceed $10,000," unless the violation is willful, in which case the maximum penalty is the greater of $100,000 or 50 percent of the amount determined under subparagraph (D). Under subparagraph (D), the amount is, in the case of a transaction, the amount of the transaction, or in the case of failing to report the

existence of an account or identifying information, the balance of the account at the time of the violation.  § 5321 (a)(5)(D).

## 2.    What Is the Congressional Purpose of FBAR Penalties?

The Government contends that FBAR Penalties are primarily remedial, and the Estate contends they are penal.  The Government argues that the purpose of the statute imposing FBAR Penalties supports its view that the statute is primarily remedial, and primarily remedial statutes survive death.  Dkt. 32.  It points out that with the passage of the America Jobs Creation Act of 2004, Congress increased the penalties for willful FBAR violations and added a penalty for non-willful failures to file.  *Id.*; *see* America Jobs Creation Act of 2004, Pub. L. No. 108-357, § 821, 118 Stat. 1418, 1586 (codified at 31 U.S.C. § 5321).  The Government claims that Congress added the non-willful variant after it received estimates that "hundreds of thousands of taxpayers with offshore bank accounts [were] attempting to conceal income from the IRS."  Dkt. 32 (citing S. Rep. 108-192, at *108 (2003)).  Some courts have recognized that "the purpose of the FBAR penalty is 'to identify persons who may be using foreign financial accounts to circumvent United States law,' and 'to identify or trace funds used for illicit purposes or to identify unreported income maintained or generated abroad.'"  *Estate of Schoenfeld*, 344 F. Supp. 3d at 1372 (citing IRS Reference Guide at 2).  The Government points out that in this case there was injury to the Government for failure to report foreign accounts because Mr. Gill had several accounts and income not reported on his original returns, and the IRS eventually had to complete an examination and propose a deficiency to Mr. Gill's income taxes for 2006 through 2010.

The Estate points out that Congress did not specifically express its intention on whether FBAR Penalties survive death.  Dkt. 33.  It notes the Government's argument that the penalties go toward costs of investigation, but it contends that this argument ignores the fact that the penalties

are disproportionate to the harm suffered.  *Id.*  It argues, in fact, that the actual harm is "arguably

zero" because "the penalty is not designed to compensate for lost revenue."  *Id.*  The costs are

applicable to all failures to file—willful and not willful—which the Estate contends renders the

remedial versus penal analysis used to determine if statutes survive death perfunctory.  *Id.*

The Senate Report relied upon by the Government states that the "reason for the change"

to include penalties for non-willful violations is as follows:

> The Committee understands that the number of individuals involved
> in using offshore bank accounts to engage in abusive tax scams has
> grown significantly in recent years.  For one scheme alone, the IRS
> estimates that there may be hundreds of thousands of taxpayers with
> offshore bank accounts attempting to conceal income from the IRS.
> The Committee is concerned about this activity and believes that
> improving compliance with this reporting requirement is vitally
> important to sound tax administration, to combating terrorism, and
> to preventing the use of abusive tax schemes and scams.  Adding a
> new civil penalty that applies without regard to willfulness will
> improve compliance with this requirement.

S. Rep. No. 108-192, at *108 (2003),  https://www.congress.gov/108/crpt/srpt192/CRPT-

108srpt192.pdf.   This statement is more supportive of a deterrent purpose, which is usually

associated with punishment and contravenes the Government's view that the statute is remedial,

but this does not necessarily support the Estate's assertion that it is penal.  *Compare Trop v. Dulles*,

356 U.S. 86, 78 S. Ct. 590 (1957) ("In deciding whether or not a law is panel, this Court has

generally based its determination upon the purpose of the statute.  If the statute imposes a disability

for the purposes of punishment---that is, to reprimand a wrongdoer, to deter others, etc., it has been

considered penal. But a statute has been considered nonpenal if it imposes a disability, not to

punish, but to accomplish some other legitimate governmental purpose."), *with United States v.

Usery*, 518 U.S. 267, 292, 116 S. Ct. 2135 (1996) (noting that a deterrent purpose "may serve civil

as well as criminal goals" and that the Court had held previously that a forfeiture serves a deterrent

purpose that is distinct from any punitive purpose; holding that *in rem* civil forfeitures, though having a deterrent purpose, "are neither 'punishment' nor criminal for purposes of the Double Jeopardy Clause"); *see also Usery*, 518 U.S. at 306 (Stevens, J.*,* concurring) (noting that the Court had previously held that a "'civil sanction that cannot fairly be said solely to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes, is punishment'" (quoting *United States v. Halper*, 490 U.S. 435, 448, 109 S. Ct. 1892 (1989), abrogated by *Hudson v. United States*, 522 U.S. 93, 118 S. Ct. 488 (1997) ("[T]he sanctions at issue here, while intended to deter future wrongdoing, also serve to promote the stability of the banking industry. To hold that the mere presence of a deterrent purpose renders sanctions 'criminal' for double jeopardy purposes would severely undermine the Government's ability to engage in effective regulation of institutions such as banks.")).  Since the penalties imposed are for non-willful violations, the deterrent purpose is towards a broader audience who will want to make sure they are following tax regulations to avoid steep penalties as opposed to punishing the individual upon whom the penalty is assessed—who obviously did not willfully fail to file.

### 3.   What Does the IRS Say?

The Estate argues that the IRS Manual supports its argument that the statute is penal. Dkt. 31.  Specifically, it notes that the IRS Manual acknowledges that FBAR Penalties "'promote compliance with FBAR reporting and recordkeeping requirements,'" which they contend means that the penalties are to redress the general public wrong of improper reporting of foreign accounts. *Id.* (quoting Internal Revenue Manual 4.26.16.6.4).[1]  The Government asserts that the Manual "is

---

[1] While the IRS Manual is outside of the complaint, the court takes judicial notice of the manual since it is a public record and can be found on the IRS's website at

not law." Dkt. 32.  Rather, it provides "internal operating procedures for the IRS," is not "legally binding and 'do[es] not create rights in the taxpayer.'"  *Id.* (quoting *Estate of Duncan v. Comm'r of Internal Revenue*, 890 F.3d 192, 200 (5th Cir. 2018)).  In *Estate of Duncan*, the Fifth Circuit specifically instructed that that the manual is not legally binding and does not create rights in the taxpayer, but it also noted that "courts can draw on the [Internal Revenue Manual] guidelines as factors to assess the propriety of IRS actions."  890 F.3d at 200; *see also Keado v. United States*, 853 F.2d 1209, 1214 (5th Cir. 1988) ("Procedures or rules adopted by the IRS are not law.").

Here, the portion of the manual the Estate relies on advises about the factors examiners should consider when exercising their discretion in determining FBAR Penalties.  Internal Revenue Manual 4.26.16.6.4, https://www.irs.gov/irm/part4/irm_04-026-016.  It states that penalties "should be determined to promote compliance with the FBAR reporting and recordkeeping requirements" and that examiners "must consider whether the issuance of a warning letter and the securing of delinquent FBARs, rather than the determination of a penalty, will achieve the desired result of improving compliance in the future."  *Id.*  Certainly, the manual supports the Estate's view that FBAR Penalties are penal, or at least meant to have a deterrent impact, but it does not indicate that the penalties are primarily penal.  While it is possible that word about non-willful violations would spread and people would be more likely to investigate the regulations more diligently for threat of significant penalties should there be a non-willful violation, and the IRS Manual supports this possibility, it does not sufficiently indicate that the penalties are primarily punitive such that the court should dismiss the claim at this juncture.

---

https://www.irs.gov/irm/part4/irm_04-026-016.  *See Walker*, 938 F.3d at 735 ("Judicial notice may be taken of matters of public record.").

The text of the statute, Congressional Record, and IRS Manual inform the court's analysis, and they indicate that the statute has some deterrent purpose but do not preclude a potential remedial purpose. The court now turns to the cases relied upon by the parties.

**D.    Caselaw**

The Estate primarily relies on the *In re Wood* test, which it contends establishes that the primary purpose of FBAR Penalties is punitive and the penalties should therefore not survive death. It argues that the question is not whether any aspect of the statute is remedial, but whether the *primary* purpose is. Dkt. 31. It asserts that the U.S. Supreme Court has held that even if a statute has *some* remedial purpose, if there is also a retributive or deterrent purpose, the statute is punitive. *Id.* (citing *United States v. Bajakajian*, 524 U.S. 321, 329, 118 S. Ct. 2028 (1998) (holding that a forfeiture of currency under 18 U.S.C. § 982(a)(1) constitutes punishment); and *Austin v. United States*, 509 U.S. 602, 610, 113 S. Ct. 2801 (1993) (noting, after setting forth significant historical context, that "forfeiture generally and statutory *in rem* forfeiture in particular historically have been understood, at least in part, as punishment")).

The Estate acknowledges that a "few district courts, in non-binding circuits, have found the willful variant of the FBAR penalty survives death." *Id.* (citing *Estate of Schoenfeld*, 344 F. Supp. 3d 1354). But the Estate asserts that at least one other court has found failure to file an FBAR is a wrong to the state and is assessed as a punishment. *Id.* (citing *United States v. Simonelli*, 614 F. Supp. 2d 241, 247 (D. Conn. 2008)). The Estate argues that the courts finding that FBAR Penalties survive death relied on the *Kennedy* factors outlined in *Hudson*, and these factors are used to determine if a "civil penalty was so punitive as to transform it into a criminal penalty, such that a criminal prosecution would be barred under double jeopardy principles," not to determine whether a statute is primarily penal or remedial. *Id.*

The Government asserts that *all* courts that have considered this issue have concluded that FBAR Penalties survive death because they are more remedial than punitive. Dkt. 32 (citing *Estate of Schoenfeld*, 344 F. Supp. 3d at 1370; *Green*, 457 F. Supp. 3d at 1272; *United States v. Park*, 389 F. Supp. 3d 561, 575 (N.D. Ill. 2019); *Wolin*, No. 2020 WL 6481477). Additionally, others have found that the United States may pursue FBAR assessments against the heirs of non-reporting account holders, though these cases did not address the remedial versus punitive paradigm. *Id.* (citing *United States v. Garrity*, 304 F. Supp. 3d 267 (D. Conn. 2018); *United States v. Kelley-Hunter*, 281 F. Supp. 3d 121, 124 (D.D.C. 2017)).

The reality is that no party cites a case in which the court has considered whether FBAR Penalties for non-willful conduct are primarily remedial or penal. The court therefore will consider each of the cases cited and then determine how they contribute to the analysis.

## 1. Cases Supporting the Government's View: *Estate of Schoenfeld*, *Green*, *Park*, and *Wolin*

In *United States v. Estate of Schoenfeld*, 344 F. Supp. 3d 1354, the Government originally filed a case to get a judgment for failure to file an FBAR on an account in Switzerland. After the taxpayer died, the Government amended the complaint to name the estate and the taxpayer's son. 344 F. Supp. 3d at 1359. The penalty at issue in *Estate of Schoenfeld* was assessed for a willful failure to file an FBAR. *Id.* The defendants moved to dismiss or for summary judgment because the statute was punitive and the action did not survive the taxpayer's death. *Id.* at 1359–60. The court determined whether the FBAR penalty was punitive or remedial by considering the *Kennedy* factors set forth in *Hudson*. *Id.* at 1370. The parties had agreed that these factors applied. *See id.*

The *Estate of Schoenfeld* court found that, under the *Kennedy* framework, the FBAR penalty was remedial in nature and the claim survived the original defendant's death. *Id.* It

considered each of the seven *Kennedy* factors and found that (1) the penalty did not involve an affirmative disability or restraint (like being imprisoned); (2) monetary penalties have not historically been regarded as punishment; (3) the penalty applies regardless of scienter (though it impacts the amount); (4) it promotes retribution and deterrence, though "all civil penalties have some deterrent effect" and "none are solely remedial"; (5) a willful failure can result in a criminal penalty, but the inclusion of a criminal penalty does not render the money penalty criminally punitive; (6) the "FBAR penalty serves the additional alternative purpose of acting as a safeguard for the protection of the revenue and to reimburse the Government for the heavy expense of investigation and the loss resulting from the taxpayer's funds; and (7) "the FBAR penalty is not excessive in relation to this alternative purpose." *Id.* at 1370–73 (cleaned up) (weighing the *Kennedy* factors). The court concluded that there was no indication that the FBAR penalty, which Congress specifically expressed is a civil sanction, is penal in nature. *Id.* at 1374. The court thus denied the motion to dismiss to the extent it was based on the contention the claim abated upon the taxpayer's death. *Id.* at 1376.

In *United States v. Green*, the U.S. district court for the Southern District of Florida considered whether FBAR Penalties assessed for willfully failing to disclose accounts and file FBARs survived death by considering whether they were penal or remedial. 457 F. Supp. 3d at 1268. It noted that courts typically examine the factors in *In re Wood* to make this distinction, but pointed out that the factors "do not allow for a situation where the United States itself has suffered a harm because of a defendant's conduct." *Id.* at 1268–69. Thus, while finding the *In re Wood* factors instructive, the court also found the *Kennedy* factors relied upon in *Estate of Schoenfeld* "helpful because the analysis may be implemented to provide a robust examination as to whether a penalty is remedial or penal in nature." *Id.* at 1269. The court decided to examine "the relevant

considerations which are embodied in both [the *Kennedy* and *In re Wood*] analyses to determine whether the FBAR penalty is remedial or penal." *Id.* at 1270.

In conducting this analysis, the *Green* court noted that the statute itself denotes that the penalties are "civil." *Id.* It then found that the Government had suffered an individual monetary harm (as opposed to a more general harm to the public) due to the decedent's conduct because the Government "likely expends significant resources on investigating foreign accounts." *Id.* It found that "the FBAR penalty has a remedial purpose [because] it allows the Government to recover for the aforementioned monetary harm." *Id.* The statute, however, also has "deterrent and retributive purposes" but "those purposes [do] not unilaterally render the FBAR penalty penal in nature." *Id.* at 1271. It determined that the penalty "is not wholly disproportionate to the harm the Government itself has suffered" because, for willful violations, the amount is tied to the account's balance (or $100,000), and it "need not be tied to the Government's loss directly to be remedial." *Id.* (citing *Bajakajian*, 524 U.S. at 342–43). The penalty for willful violations "ties the amount to the balance of the account, which reflects Congress' likely determination that the value of harm to the Government itself is correlated to the balance of the account." *Id.* The court asserted that the penalty amount "was selected to ensure that the Government would be made completely whole." *Id.* It found that "because FBAR violations likely deprive the Government of taxes on investment gains and require the Government to expend significant resources investigating foreign accounts, the FBAR penalty is not wholly disproportionate to the monetary harm the Government itself suffers." *Id.* at 1272. In addition to these factors, the court opined that it would be inappropriate to grant a "windfall to estates of violators of the FBAR requirements." *Id.* While it found, after these considerations, that the penalty does not fit neatly in either the remedial or penal category, it determined the penalty is "primarily remedial with incidental penal effects." *Id.*

In *United States v. Park*, the U.S. district court for the Northern District of Illinois similarly held that FBAR Penalties survive the death of the person who willfully failed to file an FBAR form during his lifetime. 389 F. Supp. 3d at 576. The court relied on *Estate of Schoenfeld* and agreed that the penalties are remedial rather than punitive. *Id.* It held that "the estate of a person who willfully fails to file an FBAR form during his lifetime cannot avoid the penalty that person would not have avoided if he had lived." *Id.*

In *United States v. Wolin*, the U.S. district court for the Eastern District of New York considered the same issue and noted that all the courts that had considered whether FBAR Penalties survive the death of a party have found that the penalty is remedial. 489 F. Supp. 3d at 27 (citing *Estate of Schoenfeld* and *Park*). The estate's representative in *Wolin* had requested that the *In re Wood* test be applied, but the court rejected the use of the *In re Wood* test, stating that the *In re Wood* factors do not work when the wronged party is the United States itself. *Id.* at 28. The *Wolin* court was persuaded by the "predominant consensus that the FBAR penalty claim is remedial"; it relied heavily on *United States v. Green*. *Id.* at 29.

### 2. Cases Supporting the Estate's View: *Simonelli*, *Bajakajian*, *Bittner*, *Kaufman*, and *Boyd*

The Estate relies on *United States v. Simonelli* for the proposition that FBAR Penalties are penal and not remedial and thus should not survive death. In *Simonelli*, the U.S. District Court for the District of Connecticut held that a debt for an FBAR penalty was nondischargeble in bankruptcy. The defendant had three accounts in the Bahamas and was required to report them on an FBAR but failed to do so. 614 F. Supp. 2d at 241–42. He consented to an assessment of $25,000 for a willful failure to file. *Id.* at 242. He, however, failed to pay the penalty, and the Government filed a civil case to collect the penalty plus interest. *Id.* In the interim, the defendant

had obtained a general discharge in bankruptcy, and he argued that the FBAR penalty was discharged at that time. *Id.* The Government argued that the penalty was exempt from a bankruptcy discharge. *Id.* The defendant argued that the FBAR penalty was a tax penalty imposed in lieu of taxes and was thus dischargable under 11 U.S.C. § 523(a)(7). *Id.* at 243.

The court considered whether an FBAR penalty for willfully failing to provide a report is a "penalty" or a "tax." *Id.* at 242, 244. It noted that a plain reading of the Bank Secrecy Act indicates it is a "civil penalty," notwithstanding the defendant's argument that it is, "in essence, actually a tax." *Id.* at 244. The court found that the debt "was imposed pursuant to a non-tax law," which the defendant sought "to recharacterize as a tax law." *Id.* at 245. The court determined that "[b]ecause there is no tax underlying the FBAR penalty, the FBAR penalty cannot be considered a tax penalty." *Id.* at 247. It found the penalty was a "penalty" (not a "tax") within the meaning of § 523(a)(7) and, as such, it was excepted from discharge in bankruptcy. *Id.* While the court found the FBAR penalty assessed in *Simonelli* was a "penalty" within the meaning of 11 U.S.C. § 523(a)(7), which supports the Estate's arguments that it is a penalty in this case, the *Simonelli* court was considering whether it was a "civil money penalty" or a "tax"; it was not considering whether the penalty was primarily penal or remedial.

The Estate also relies on *United States v. Bajakajian* for the proposition that if there is some retributive or deterrent purpose, the statute is punitive. *See* Dkt. 31. The *Bajakajian* Court concluded that a forfeiture of currency under 18 U.S.C. § 982(a)(1) constitutes punishment. 524 U.S. at 328. Under that statute, forfeiture is "an additional sanction when 'imposing sentence on a person convicted of' a willful violation of" the reporting requirement in 31 U.S.C. § 5316.[2] *Id.*

---

[2] The § 5316 violation in *Bajakajian* related to willfully failing to file a report that Bajakajian was transporting more than $10,000 outside of the United States. 524 U.S. at 325.

The Court noted that the forfeiture was "imposed at the culmination of a criminal proceeding and requires conviction of an underlying felony, and it cannot be imposed upon an innocent owner of unreported currency, but only upon a person who has himself been convicted of a § 5316 reporting violation." *Id.* The Government had argued that a forfeiture under § 982(a)(1) also served a remedial purpose, which was to control what property leaves and enters the country and that forfeiture deters "'illicit movements of cash'" and aids "in providing the Government with 'valuable information to investigate and detect criminal activities associated with that cash.'" *Id.* at 329 (quoting the Government's brief). The Court pointed out, however, that "[d]eterrence . . . has traditionally been viewed as a goal of punishment, and forfeiture of the currency here does not serve the remedial purpose of compensating the Government for a loss." *Id.* The Court reasoned that the loss of information suffered by the Government "would not be remedied by the Government's confiscation of the respondent's $357,144." *Id.* The Court found that the "forfeiture serves no remedial purpose, is designed to punish the offender, and cannot be imposed upon innocent owners." *Id.* at 332. It thus found that the forfeiture is punitive and constitutes a "fine" under the Excessive Fines Clause. *Id.* at 333. While the Supreme Court's viewpoint on the remedial purpose espoused by the Government in *Bajakajian* is certainly instructive, this case is not be as helpful as the Estate asserts because the forfeiture—unlike the penalty in this case— could not be imposed on an innocent owner of unreported currency. Moreover, while the *Bajakajian* Court noted that the Government's loss would not be remedied by confiscating the money in that case, here, the Government asserts that it had to conduct an examination into Mr. Gill's accounts because he did not file the reports, so it seems the recovery would be a direct remedy for that loss, at least to some extent, here.

The Estate additionally points to cases that have found that the fact that the Government applies the penalty for non-willful violations per account as opposed to per missing FBAR filing is excessive. Dkt. 31 (citing *United States v. Bittner*, 469 F. Supp. 3d 709 (E.D. Tex. 2020), and *United States v. Kaufman*, No. 3:18-CV-00787 (KAD), 2021 WL 83478 (D. Conn. Jan. 11, 2021)). The Estate contends that these cases support its argument that FBAR Penalties are disproportionate to the alleged harm suffered. *Id.* In *United States v. Bittner*, the federal district court for the Eastern District of Texas considered whether the text of § 5321(a)(5)(A) and (B)(i) for non-willful violations of the regulations implementing § 5314 indicates that the penalties apply per foreign account or per annual FBAR report. 469 F. Supp. 3d at 716. The court "conclude[d] that non-willful FBAR violations relate to each FBAR form not timely or properly filed rather than to each foreign financial account maintained but not properly reported." *Id.* at 717. The court determined that because Congress used different language for the penalty for non-willful violations than it did for willful violations—excluding references to the existence of and balance on accounts in the former—it must have "intended the penalty for willful violations to relate to specific accounts and the penalty for non-willful violations not to." *Id.* at 720–21. It also noted that interpreting the statute this way would avoid "absurd outcomes." *Id.* at 721. The Government argued in *Bittner*, like it argues here, that hidden foreign accounts increase investigation costs and potential damage to the government in terms of lost tax revenue, rendering the penalties remedial; the court found this concern legitimate but overstated. *Id.* It noted that there may not be any connection between the number of foreign accounts and lost tax revenue, and even though there may be higher costs associated with investigating extra accounts, "that concern is simply not strong enough" to convince the court to "change its analysis of the statute's meaning." *Id.* at 722.

In *United States v. Kaufman*, the court also construed the statute to determine if the Government could impose the penalty per account as opposed to per report. It reasoned that the reporting obligation is triggered by the aggregate balance of all foreign accounts, so it does not make sense to read the section imposing penalties for non-willful violations to apply on a per account basis rather than a per report basis. 2020 WL 83478, at *9. Also, interpreting the statute as applying per account "could readily result in disparate outcomes among similarly situated people" because the penalties could vary drastically for the same aggregate amount in foreign accounts if one person has this amount split among multiple accounts. *Id.* at *10.

The Ninth Circuit recently considered the same issue and reached a similar conclusion. *See United States v. Boyd*, 991 F.3d 1077 (9th Cir. 2021). The Ninth Circuit strictly construed the statute and determined that the "non-willful penalty provision allows the IRS to assess one penalty not to exceed $10,000 per violation, and nothing in the statute or regulations suggests that the penalty may be calculated on a per-account basis for a single failure to file a timely FBAR that is otherwise accurate." *Id.* at 1085. While these cases would be helpful if the court were determining the propriety of the amount assessed, in general, here the court simply must consider the amount that was assessed and determine if it is not proportionate to the amount of loss as part of its remedial versus penal analysis.

### 3. Application of the Cases

Neither *Simonelli* nor the cases finding the penalty should only be assessed per year rather than per account convinces the court that the penalty is primarily penal and should not survive death. The *Simonelli* court determined the FBAR penalty was a "penalty" and not a tax; it is not very helpful because, notwithstanding the Estates' interpretation of *Bajakajian*, a fine can be a penalty and still be primarily remedial. And the cases holding that the statute for non-willful

violations should only be assessed on a per-year as opposed to per-account basis do not demonstrate that the penalty is disproportionate to the remedial purpose of the statute. Here, the penalties were assessed on a per-account basis, and that interpretation of the statute by the Secretary indicates that the Secretary assesses fines for the remedial purposes espoused here— each account not disclosed is an account the Government would need to look for, resulting in greater investigation costs. Thus, the Secretary is at least applying the statute in a remedial way. And even if Congress meant, as the cases that the Estate points to that have considered the question of whether penalties for non-willful violations should be assessed per account have found, for the penalties to only be assessed per year, it still does not necessarily lead to the conclusion that the penalty was meant to by primarily penal rather than remedial.

The court is more persuaded by the multiple cases that have found FBAR Penalties to be primarily remedial. While most of these cases relied on *Hudson* and the *Kennedy* factors, the court finds that even if one were to apply the *In re Wood* test espoused by the Estate, modified to take into consideration that the Government is the wronged party here, the penalties would survive death. As to the first *In re Wood* factor, whether the purpose of the statute is to redress individual wrongs or more general wrongs to the public, *see Wood*, 643 F.3d at 191, the Estate asserts that the statute addresses general wrongs to the public, not individual wrongs, as the penalties are paid to the U.S. treasury, not any individual, and the funds do not compensate the Government for any harm because the only harm caused by failure to report is that the Financial Crimes Enforcement Network has less information. The Estate asserts that for the statute to be remedial, the harm must be a "direct injury." However, when one considers that the United States is the "wronged party" here, the penalties redress an individual wrong in that the penalties are paid, at least in part, to cover the expenses brought about by the wrong—the costs the government must pay to investigate

undisclosed accounts.  Of course, the penalties also redress general wrongs to the taxpayers who have to fund all of these investigations.  This also goes to the second factor—whether recovery under the statute runs to the harmed individual or the public.  *See Wood*, 643 F.3d at 191.  While recovery of the penalty goes to the government, the government is the harmed party in this situation because, again, it is forced to do more investigations when foreign accounts are not disclosed.

As to the third factor—whether the recovery is wholly disproportionate (*see Wood*, 643 F.3d at 191)—the Estate contends that the penalties are disproportionate to any alleged harm because they are for non-willful conduct and have nothing to do with lost tax revenue.  It points out that both Mr. and Ms. Gill both were assessed penalties for failing to file, yet Mr. Gill's penalty is $784,608.78 and Ms. Gill's is only $55,304.55, even though each failed to file the same number of forms.  However, this argument ignores the fact that Mr. Gill's penalties are higher because he had more unreported accounts.  Since the penalties increase with the number of unreported accounts, at least under the Secretary's current interpretation, they are not wholly disproportional to the harm.

Under the *Hudson* analysis, the only differences between this case, which involves a non-willful violation, and the cases relied on by the Government, are in the third factor and perhaps the seventh.  The third factor is whether it comes into play only on a finding of scienter, and this factor weighs even more heavily against a finding that the statute is penal since the violation here is not willful.  *Cf. Estate of Schoenfeld*, 344 F. Supp. 3d at 1371 (noting that the third factor supports a finding that the statute is remedial because the Secretary can assess a penalty regardless of scienter but acknowledging that it "affects the amount of the assessment").  The seventh factor is whether the FBAR penalty is excessive in relation to its remedial purpose, which is to fund the government's investigation into foreign bank accounts.  While there is no record in this case at this

point regarding the cost to investigate foreign bank accounts, the large amount of the sanctions assessed against Mr. Gill suggests the sanctions have some punitive (or at least deterrent) and some remedial attributes. The fact that the Congressional Record and the IRS Manual suggest a deterrent purpose colors this assessment to some extent, but not enough for the court to determine the balance swings from remedial to penal in light of the number of courts that have found otherwise in cases involving willful violations. Since at the motion to dismiss stage and ambiguities must be resolved in favor of the non-movant, the court finds that given the "close call" nature of this question, the doubt should be resolved in favor of the Government.

### IV. CONCLUSION

Because this is a close call and ambiguities in the law must be resolved in favor of the plaintiff, the court finds that the purpose of the statute is primarily remedial and the claim therefore survives Mr. Gill's death. The Estate's motion to dismiss (Dkt. 31) is DENIED.

Signed at Houston, Texas on June 30, 2021.

Gray H. Miller
Senior United States District Judge